**LORONA STEINER DUCAR, LTD.**
3003 North Central Avenue, Suite 1500
Phoenix, Arizona 85012-2909
Telephone: (602) 277-3000
Facsimile: (602) 277-7478

**Jess A. Lorona, #009186**
**Gregory E. McClure, #022587**
jlorona@azlawyers.com
gmcclure@azlawyers.com
**Attorneys for Plaintiff**

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| WALTER D. "ROB" ROBINSON, | Case No. CV09-1543-PHX-JWS |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| -vs- | |
| CITY OF PHOENIX; | |
| Defendants. | |

Plaintiff, WALTER D. "ROB" ROBINSON ("Robinson"), by and through his counsel undersigned, for his First Amended Complaint states as follows:

**PARTIES AND JURISDICTION**

1. Robinson is, at all times relevant, a resident of Maricopa County, Arizona.

2. Defendant, CITY OF PHOENIX ("PPD"), at all times relevant, is a political subdivision of the State of Arizona and located in Maricopa County, Arizona.

1

3. All acts complained of herein took place in Maricopa County, Arizona within the District of Arizona.

4. Subject Matter Jurisdiction is proper pursuant to 28 U.S.C. § 1331.

5. Defendant is subject to the personal jurisdiction of this Court.

6. Pursuant to 28 U.S.C. § 1391, venue is proper in this Court.

**GENERAL ALLEGATIONS**

7. Robinson incorporates each and every allegation set forth above as if more fully set forth herein.

8. Until the events described below, Robinson has a long and positive history with Phoenix Police Department, having served within the Department for over 26 years.

9. While employed with PPD, Robinson earned a Bachelor of Arts in Public Administration.

10. In 1982, Robinson began his career with PPD as a patrol officer. Within six years he was promoted to Sergeant in the Sky Harbor and Central City Precincts.

11. In 1994, Robinson was promoted to Lieutenant and Patrol Shift Commander in the Squaw Peak Precinct.

12. From October 1997 through January 2005, Robinson served as the Commander for the Robbery, Auto Theft and (interim) Homicide Units, Violent Crimes Bureau.

13. As Commander of the Robbery, Auto Theft and Homicide Units, Robinson oversaw the investigation of approximately 4,500 robbery related crimes per

year, including, armed robbery, bank robbery, carjacking, extortion, kidnapping and home invasion crimes. He also directly supervised approximately 100 kidnapping investigations per year.

14. In 2001, Robinson received the Phoenix Police Chief's Unit of the Year Award for clearing 87 of 114 bank robberies. Robinson achieved a 76 percent clearance rate, which was second highest in the country for major cities that year.

15. Robinson partnered with Immigration and Customs Enforcement (ICE) to develop departmental policy and procedures for investigations involving undocumented persons and was second level-supervisor on major crimes involving undocumented persons.

16. Robinson provided second-level supervision of approximately 50 homicide investigations and 20 police shooting investigations, as well as provided second level supervision of the investigation and arrest of the Baseline Killer and Serial Shooters.

17. In 2007, Robinson received a letter of commendation and a commemorated coin from Phoenix City Mayor Phil Gordon for his commitment to the community and his role in the investigation that led to the arrest of the Baseline Killer and Serial Shooters. A true and correct copy is attached hereto as Exhibit A.

18. Throughout Robinson's 26 year career, he received the highest score permissible in each of his 26 annual performance evaluations, and was never given discipline or sustained misconduct; a feat almost unheard of in law enforcement.

19. Robinson was involved in his community and on February 7, 2007, Mayor Phil Gordon appointed Robinson to the Ahwatukee Foothills Village Planning Committee. A true and correct copy of the Appointment Letter is attached hereto as Exhibit B.

20. In addition, Robinson served two years as Street Enforcement Unit Commander for the Drug Enforcement Bureau, where he supervised three undercover detective squads, one HITDA clandestine lab squad and one methamphetamine lab squad.

21. As Unit Commander in the Drug Enforcement Bureau, Robinson helped author, implement and enforce the City of Phoenix's Pseudoephedrine Ordinance which resulted in reducing the city's methamphetamine lab seizures by nearly 85%.

22. Robinson's resume of Experience and Education is attached hereto as Exhibit C.

23. Late in his career, Robinson entered the PPD's Deferred Retirement Option Plan, also called "DROP," which, in part, mandated that he retire by a date certain in exchange for various retirement benefits. His set retirement date was August 22, 2008.

24. In January 2008, Robinson was offered the position of Program Manager with the Southwest Border High Intensity Drug Trafficking Area, ("HIDTA").

25. HIDTA was established by the U.S. Congress through the Anti-Drug Abuse Act of 1988 (P.L.100-690, November 18, 1988) and the ONDCP

4

Reauthorization Act of 1998; HIDTA provides Federal assistance to better coordinate and enhance counterdrug law enforcement efforts in areas where major drug production, manufacturing, or distribution flourish.

26.     PPD agreed to contract Robinson to HIDTA beginning in January 2007 through August 22, 2008.

27.     The date of August 22, 2008 was chosen so as to not jeopardize Robinson's retirement under the DROP program.

28.     In April of 2008, due to exceptional performance in his role as HIDTA Program Manager, Robinson was promoted from HIDTA Program Manager to acting Deputy Director.

29.     Soon after accepting the position of HIDTA acting Deputy Director, Robinson was told by local HIDTA management (HIDTA Director Terry Azbill ("Azbill"), U.S. Marshall and HIDTA Chair David Gonzales ("Gonzales"), and ACJC Deputy Director Karen Ziegler ("Ziegler")) that he would be awarded the permanent position of HIDTA Deputy Director after retirement on August 22, 2008.

30.     In June of 2008, Robinson received a letter of commendation from Lieutenant Steven Bailey, of the Maricopa County Meth Task Force, MCMTF, for his HIDTA leadership in conjunction with other drug enforcement agencies. A copy of this letter is attached as Exhibit D.

31.     Pamela Cullison ("Cullison") is and was the Financial Manager of HIDTA and, as such, oversaw HIDTA monies.

32.     Beginning in January 2008, Robinson and Cullison worked for HIDTA

in the same office location.

33. Cullison is a close friend, if not intimate friend, of Gonzales.

34. Cullison learned of the Financial Manager's position opening only through her relationship with Gonzales.

35. Gonzales encouraged Cullison to apply for the position and then assisted her with preparation for working in the position which she was eventually awarded.

36. Cullison demonstrated her relationship with Gonzales in January 2008 when she showed Robinson explicit photographs of her and Gonzales together.

37. These photographs showed Cullison in a scantily clad outfit including fishnet stockings, platform high heels and a partially opened blouse while leaning Gonzales over a bar and spanking his buttocks with a nightstick.

38. Cullison said the photographs were taken while Cullison and Gonzales were on a trip together in Austin, Texas prior to her becoming a HIDTA employee. Gonzales later verified that these photographs existed as described.

39. Cullison repeatedly displayed her close relationship with Gonzales to Robinson, Azbill, Ziegler and others by describing her routine happy hour meetings with Gonzales after work, her intra and interstate trips with Gonzales while employed with HIDTA, excessive drinking with Gonzales, late night dinners with Gonzales in Tucson, an opportunity to move to Washington D.C. with Gonzales and accept a position if Gonzales were awarded a Cabinet position through his wife's relationship with then Arizona Governor Janet Napolitano, a possible appointment as Maricopa County Sheriff's Office Financial Director if Gonzales were elected Maricopa County

Sheriff, and a multitude of other statements. All or part of these statements made by Cullison were later acknowledged and verified by Azbill, Ziegler and Gonzales.

40.     Cullison further demonstrated her close relationship with Gonzales by complaining about Robinson and others directly to Gonzales. Gonzales then failed to follow Chain of Command protocol and personally gave instructions to Robinson on how to conduct business with Cullison.

41.     Cullison used her relationship with Gonzales to intimidate and control HIDTA personnel and affiliated personnel, including Robinson. This became apparent to Robinson soon after he began working with Cullison. This also became apparent to Azbill and Ziegler.

42.     In May 2008, and then again in late July 2008, Gonzales and Cullison traveled together on HIDTA's "dime." Soon after, Ziegler informed Gonzales that many people at the Law Enforcement Pow Wow that occurred in Flagstaff, Arizona, were commenting, becoming suspicious and concerned about Gonzales' relationship with Cullison.

43.     From January through July 2008, Cullison repeatedly told Robinson his ability to remain employed with HIDTA after retirement was under her control due to her relationship with Gonzales and all it would take was "one phone call" to Gonzales if Robinson did not do as she said.

44.     Believing his job was at stake, Robinson worked diligently to foster a close professional relationship with Cullison.

45.     However, as their professional relationship continued, Cullison made

7

requests of Robinson and took actions that were beyond profession, including:

    A.    Cullison had Robinson escort her to her car every night after work.

    B.    Robinson repaired water pipes at Cullison's home in February 2008 and again in mid-June 2008.

    C.    Cullison shared stories of a personal nature with Robinson.

    D.    On his birthday, March 20, 2008, Cullison gave Robinson an unwelcome, sexually suggestive birthday card sighed with "Love (heart shape) Pam," along with an Outback Steakhouse gift certificate for $50.00. Robinson never used the gift certificate as he believed it was inappropriate.

    E.    While Cullison knowingly made false allegations that Robinson sent her e-mails containing pornography, just the opposite is true. Robinson never sent any such e-mails to Cullison. However, in all Cullison sent Robinson approximately 62 e-mails and or captions to his HIDTA and home computer which contained nudity, racism, homophobia, sexism; some of which bordered on pornography. The delay caused by investigating Cullison's false allegations made Robinson ineligible for the Deputy Director hiring process timeline.

46.    Finally, around May 2008, Robinson decided that he could no longer endure Cullison's behavior and repeated threats to sabotage his career with HIDTA.

47.    As a result, Robinson reported Cullison's behavior to Gonzales, Azbill (Robinson's immediate supervisor at HIDTA), Arizona HIDTA's fiduciary, ACJA

Deputy Director Karen Ziegler, and to PPD Commander Michael Parra (Robinson's immediate supervisor at PPD). No investigation was conducted by Azbill, Ziegler or Parra (PPD maintains a policy that demands an investigation be conducted in these situations).

48. Again in July, 2008, Robinson approached Azbill and informed him regarding inappropriate conduct, this time between Cullison and Gonzales. In or about July 2008, Robinson attended a conference in Flagstaff, Arizona. Cullison and Gonzales also attended. Although Cullison attendance was only needed for half of one day during the conference, Gonzales arranged for Cullison to stay for the entire four day conference. Gonzales and Cullison drove to Flagstaff together.

49. During the conference Robinson was summoned out of a meeting by Gonzales to discuss Cullison. Gonzales advised Robinson that Cullison had come to Flagstaff with him; however, Gonzales's wife was making an unexpected trip to join him at the conference. Gonzales instructed Robinson that he would need to drive Cullison home before his wife arrived the following morning.

50. Upon information and belief, Gonzales made this request of Robinson so that Gonzales' wife would not catch on to Gonzales' relationship with Cullison.

51. Robinson immediately reported to Azbill of Gonzales' misuse of department funds, the ongoing affair, and Gonzales' inappropriate request of Robinson to drive Cullison back to Phoenix in an attempt to avoid any contact between Cullison and his wife. Again, no investigation into misconduct of Cullison or Gonzales occurred.

9

52. During Robinson's very next working day after refusing to drive Cullison home, Cullison retaliated with false allegations against Robinson.

53. On or about July 28, 2008, Cullison made allegations to Gonzales that Robinson had made inappropriate comments to her many months earlier but was only now reporting them.

54. Cullison did not make these allegations to her supervisor or other HIDTA personnel, but rather she reported these incidents to her close friend, Gonzales.

55. Cullison alleged that Robinson has stated that she "should get a boob job" and that she should wear high heels "to enhance her butt."

56. These allegations made by Cullison were ultimately determined to be utterly and completely false.

57. Upon information and belief, Gonzales and Cullison further colluded against Robinson.

58. Upon information and belief, Gonzales realized that Robinson knew that Gonzales and Cullison were having an extra-marital affair and became uneasy with Robinson's continued employment as Deputy Director for HIDTA.

59. Upon information and belief, Gonzales had already learned that Robinson had informed Azbill of the affair.

60. Upon information and belief, following the July 28, 2008 allegations of improper conduct, investigation, and a finding that Cullison and Robinson could continue working together in a professional manner, Gonzales continued to interfere

1 with Robinson's position and potential placement as the permanent Deputy Director of

2 HIDTA.

3   61.   Upon information and belief, Gonzales convinced Cullison to make

4 additional false accusations against Robinson.

5   62.   Upon information and belief, Gonzales knew that a prolonged

6 investigation into improper or inappropriate conduct by Robinson would ultimately

7 preclude Robinson from being considered for the Deputy Director position even

8 though it had been previously promised to him by Azbill, Ziegler and Gonzales.

9   63.   On August 4, 2008, at approximately 11:30 a.m., and again on August 5,

10 2008, at approximately 9:00 a.m., Cullison made various statements of and concerning

11 Robinson to Azbill.

12   64.   Specifically, Cullison made the following accusations against Robinson:

13      A.   That Robinson had made "sexually suggestive comments" about

14 her body which offended her;

15      B.   That Robinson had "shown her pornography" on his HIDTA

16 computer;

17      C.   That Robinson "sent pornography" to Cullison's personal e-mail

18 address;

19      D.   That Robinson had made comments about the type of shoes she

20 should wear to "enhance her bottom";

21      E.   That Robinson had discussed the "sexual activity of her brother

22 and his wife" with Cullison;

11

  F. That Robinson has discussed sexual activity of others within the office and referred to yet another person within the office as a "pincushion";

  G. That Robinson was "suicidal" or "homicidal";

  H. That she was offended by Robinson's comments;

  I. That she had tried to handle the matter but Robinson would not stop even though she asked him to;

  J. That she is worried about retaliation, and that she wants a safe and harassment free work place.

65. Unlike when Robinson complained of inappropriate conduct by Cullison and Gonzales, Azbill took immediate action regarding Cullison's allegations. Azbill wrote a letter to PPD containing Cullison's statements and inquired as to what action PPD would take. Azbill wrote a similar letter to ACJC Director Blackburn.

66. PPD investigated all allegations against Robinson. No allegation was proven to be true.

67. Robinson was due to retire with PPD's DROP on August 22, 2008.

68. Around the time Robinson became acting Deputy Director for HIDTA, Robinson had been told by Azbill, Gonzales, and Ziegler that he was the most qualified person for the position and would be awarded the Deputy Director position on a permanent basis following his retirement from PPD in August, 2008.

69. HIDTA was prepared to fill the Deputy Director's position permanently effective August 25, 2008, three days after Robinson's retirement.

70. The HIDTA Deputy Director selection process was cancelled upon

hearing of Cullison's allegations against Robinson.

71. Additionally, Robinson's PPD Reserve officer position was terminated specifically and exclusively due to the allegations raised by Cullison.

72. Following PPD's investigation and Robinson's return to PPD from HIDTA, Robinson filed a Notice of Claims as required by A.R.S. § 12-821.01 on or about February 2, 2009. Following the Service of the Notice of Claims on Jack Harris, PPD sustained violations by Robinson of administrative procedures.

73. Due to the actions of the Defendant, Robinson also lost his opportunity to work as a reserve officer with the Homeland Security Division.

74. As a result of the foregoing conduct by Defendant, Robinson has been damaged in many ways.

75. Robinson has suffered extreme and severe emotional distress.

76. Robinson's professional reputation has been damaged with the local, state and federal law enforcement communities.

77. Robinson was not able to obtain the position of Deputy Director of HIDTA, which would have earned him $120,959.00 per year.

78. Robinson lost his status with PPD as a reserve police officer which would have allowed him to earn between $45.00 and $100.00 per hour through city regulated "off-duty" work even though he was retired.

79. Robinson has been unable to obtain employment in public safety.

80. The actions of the Defendant was intentional, malicious and done with an evil mind. As a result punitive damages should be assessed.

## COUNT TWO

## COMMON LAW: WHISTLEBLOWER AND RETALIATION

81. Robinson incorporates each and every allegation set forth above as more fully set forth herein.

82. Robinson reported mismanagement on the part of Gonzales and assistance of Cullison, in using HIDTA and ACJC monies to finance their romantic getaways.

83. Robinson advised Azbill, Ziegler, HIDTA and ACJC of Gonzales' and Cullison's mismanagement of funds.

84. Robinson further reported Cullison's misuse of a government issued mobile telephone, government laptop computer and government issued wireless card to Azbill.

85. Robinson repeatedly reported Cullison's threats to sabotage his opportunity to obtain the HIDTA Deputy Director position through her relationship with Gonzales to Azbill, Gonzales, Parra, and Ziegler.

86. Robinson repeatedly reported inappropriate conversations initiated by Cullison to Azbill and Ziegler.

87. No investigation was conducted into Gonzales or Cullison. Rather, in response, an investigation of Robinson was opened regarding alleged sexual harassment and other allegations made by Cullison.

88. Further, PPD supervisors intentionally inflicted unnecessary physical pain to Robinson by compelling him to be transported and walk into police

headquarters to participate in an interview that lasted five hours and forty-seven minutes as a condition of employment regarding these allegations made by Cullison.

89. At the time Robinson was under the care of a City of Phoenix physician for treatment of an on-duty injury that was ultimately diagnosed as six ruptured discs in his back, a broken right leg, contusions throughout his body, uncontrollable diarrhea, statements of losing consciousness, and severe muscle spasms.

90. Robinson was under doctor's orders for bed rest and was prescribed and taking Morphine, Xanax and other medications.

91. Conducting a "compelled" interview while suffering both physically and mentally was not only barbaric and inhumane, but also a violation of PPD policy and procedure.

92. PPD supervisors retaliated against Robinson by sustaining minor policy violations from information leaned second-hand and solely through his attorney's Notice of Claim letter delivered months after his retirement and which actions were done at the request of two assistant police chiefs with PPD.

93. Upon being advised of similar violations by two assistant chiefs, PPD refused to investigate these two assistant chiefs for the exact policy violations sustained against Robinson.

94. Although Robinson was promised, by PPD supervisors, that provisions of the MOA would be followed regarding participation in the Investigative Review Process at the conclusion of the investigation even though he would be retired, PPD supervisors retaliated against Robinson by failing to interview, much less speak to,

Robinson about sustained allegations learned only by submission of his Notice of Claim on or about February 2, 2009.

95. PPD supervisors concluded the final PSB investigation, which included numerous false, misleading and defamatory statements, yet completely ignored the truth despite Robinson's presentation of indisputable documentation showing otherwise.

96. Even though they were provided with indisputable evidence that Cullison was repeatedly untruthful throughout her interview, PPD supervisors failed to follow appropriate investigative protocol and call into question Cullison's credibility, motives or truthfulness for making such allegations against Robinson.

97. PPD supervisors falsified the final PSB investigation and called into question Robinson's "ethics" and truthfulness by reporting that he told them he never documented telephone calls or conversations with witnesses, even though he spent a full 11 minutes and 29 seconds during his compelled interview reading from handwritten notes taken during dozens of such conversations. Calling a police officer's ethics or truthfulness into question is a "death sentence" for future law enforcement employment.

98. PPD supervisors retaliated against Robinson by failing to consider, or even document in the final report, clear and indisputable exculpatory evidence that Cullison was being untruthful when she made her allegations against Robinson. Much of this information came from their forensic review of Cullison's computer.

99. PPD supervisors released an incomplete, falsified, defamatory and

inaccurate final report to the media a mere two days after it was finalized without any type of Investigative Review Process, further interview or discussion with Robinson or his attorney.

100.　PPD supervisors failed to follow their own policies, Administrative Regulation 2.35, and Operations Order 3.14, 3.18 and 3.19, regarding zero tolerance of harassment, when he repeatedly reported Cullison's repeated threats to sabotage his opportunity to obtain the Deputy Director's position after retirement thorough her relationship with Gonzales.

101.　As a result of the allegations made by Cullison only days prior to Robinson's retirement, PPD supervisors and command officers failed to provide Robinson with any type of customary retirement ceremony, gift or other recognition afforded an employee with 26+ plus years of exemplary public service.

102.　The Defendant's actions were in direct retaliation for Robinson's reporting of Gonzales and Cullison's inappropriate conduct.

103.　Additionally, Defendant intentionally retaliated against Robinson for filing a Notice of Claim regarding this incident.

104.　Defendant's intentional retaliation against Robinson caused or attributed to the damages set forth above.

105.　The Defendant is therefore liable to Robinson for its intentional retaliation against Robinson.

## **COUNT THREE**

## **VIOLATION OF CIVIL RIGHTS: DUE PROCESS**

106. Robinson incorporates each and every allegation set forth above as more fully set forth herein.

107. The acts committed by the PPD and its employees, as more fully set forth hereinabove, were such that resulted in their violation of Plaintiff's Due Process Rights under the Fourteenth Amendment, 42 U.S.C. § 1983 and 42 U.S.C. § 1985(3).

108. Defendant violated Plaintiff's Due Process Rights by failing to conduct a timely investigation into Cullison's allegations as required by the PPD Policy and Procedures Manuals. Additionally, Defendant failed to properly adhere to its own policies when conducting its interview into allegations of misconduct by Robinson and its intentional and retaliatory findings following Robinson's filing of a Notice of Claim.

109. The actions of Defendant and its employees were not in pursuit of a legitimate governmental interest.

110. The Defendant does not have a legitimate interest in failing to conduct investigations into allegations of misconduct, specifically when such a failure to investigate could have such emotional, economic and physical impact on an employee.

111. The Defendant does not have a legitimate interest in failing to follow proper procedure for investigating the allegations of misconduct by Robinson.

112. As a direct and proximate result of Defendant's purposeful and direct violation of Plaintiff's Due Process Rights, he has suffered irreparable damage to his

professional reputation.

113.  As a direct and proximate result of Defendant's purposeful and direct violation of Plaintiff's Due Process Rights, Plaintiff has suffered undue stress and anxiety in the forms of loss of sleep, loss of appetite, and has become physically ill as a result of the emotional stress suffered as a result of the actions of Defendant.

114.  As a direct and proximate result of Defendant's actions Plaintiff has suffered from loss of pay, loss of work and an inability to locate and secure comparable employment elsewhere.

115.  The Defendant is therefore liable to Robinson for its intentional violation of his due process rights.

**WHEREFORE**, Plaintiff prays for Judgment against Defendant as follows:

1.  For compensatory damages, plus special and incidental damages in such a sum as may be proven at trial;

2.  For exemplary and punitive damages in an amount to be proven at trial;

3.  For costs for the suit;

4.  For attorney's fees; and

5.  For other such relief as this Court deems just and proper.

**RESPECTFULLY SUBMITTED** this 12th day of November, 2009.

                      **LORONA STEINER DUCAR, LTD.**

                      By: __/s/Jess A. Lorona_____
                      Jess A. Lorona, Esq.
                      Gregory E. McClure, Esq.
                      Attorneys for Plaintiff

LORONA STEINER DUCAR, LTD.
ATTORNEYS AT LAW
3003 NORTH CENTRAL AVENUE, SUITE 1500
PHOENIX, ARIZONA 85012-3909
(602) 277-3000

**CERTIFICATE OF SERVICE**

I hereby certify that on November 12, 2009, I electronically filed the foregoing with the Clerk of Court, using the CM/ECF system, which will send notification of such filing to all parties, and will mail all notifications of such filing to all non-CM/ECF system participants.

s/Paula Schultz